No. 24-1410

---

In The
United States Court Of Appeals
For The Eighth Circuit

---

Association for Government Accountability, et al.,

Appellants,

vs.

Steve Simon, et al.,

Appellees.

---

**On Appeal From the United States District Court
for the District of Minnesota, No. 0:23-CV-03159**

---

**BRIEF OF APPELLEES**

---

KEITH ELLISON
Attorney General
State of Minnesota

NATHAN J. HARTSHORN #0320602
ALLEN COOK BARR #0399094
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1252

ATTORNEYS FOR APPELLEES

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

To increase voter-roll accuracy and encourage voter registration, Minnesota is part of the Electronic Registration Information Center (ERIC), a bipartisan coalition made up entirely of states and the District of Columbia. The Office of the Minnesota Secretary of State (OSS) receives reports from ERIC regarding voters or potential voters. These include reports on cross-state movers, in-state movers, duplicate registrations, deceased registrants, eligible-but-unregistered individuals, address changes, and voter participation. ERIC produces these reports based on voter and driver's license information that it receives from Minnesota and other states.

Appellants Association for Government Accountability and various associated individuals (collectively "AGA") seek to curtail the benefits that ERIC's reports bring to Minnesota's election system. They contend that sharing the necessary data with ERIC violates the Driver's Privacy Protection Act. The district court rejected AGA's claims. It held that Appellees Minnesota Secretary of State Steve Simon and Director of Elections David Maeda (collectively "the Secretary") are immune because official-capacity *Ex Parte Young* claims are unavailable under the DPPA and because AGA's individual-capacity claims are actually directed against the state. The court also denied AGA's preliminary injunction motion.

The Secretary agrees with AGA that oral argument would be helpful to the Court and join in their request for fifteen minutes for oral argument.

i

# TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ....................i

TABLE OF AUTHORITIES ...............................................................................iv

STATEMENT OF ISSUES ...............................................................................1

STATEMENT OF THE CASE............................................................................2

I.    ERIC .............................................................................................2

II.   MINNESOTA LAW AND ERIC ............................................................3

III.  INFORMATION SHARING BETWEEN DEPARTMENT OF PUBLIC SAFETY AND OSS ...................................................................................................5

IV.  PROCEDURAL HISTORY .....................................................................5

SUMMARY OF ARGUMENT .........................................................................6

ARGUMENT ...................................................................................................6

I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE SECRETARY IS IMMUNE FROM SUIT. ....................................................................7

    A.   *Ex Parte Young* Relief Is Not Available Under the DPPA. .................8

    B.   The Secretary Is Immune from AGA's Individual-Capacity Claims Because Those Claims Are Actually Directed Against the State. .................................................................................10

II.   AGA FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.........................................................................................12

    A.   AGA's Individual-Capacity Claims Do Not Allege Any Wrongdoing Personally Committed by the Secretary.........................13

    B.   The DPPA Does Not Prohibit OSS's Data Sharing. ...........................14

Appellate Case: 24-1410    Page: 3    Date Filed: 04/16/2024 Entry ID: 5384004

1. The DPPA authorizes OSS's data sharing with ERIC because it contributes to Minnesota election officials' government functions ................................................. 14

2. HAVA does not impact permissible government functions under the DPPA. ....................................................... 20

   a. HAVA does not limit voter data sharing. ....................... 20

   b. HAVA does not prohibit state-sponsored voter registration drives. ........................................... 21

   c. AGA forfeited its discrimination argument, and it is meritless. ......................................................... 23

3. The DPPA authorizes OSS's data sharing with ERIC for research. ............................................................... 25

III. THE DISTRICT COURT PROPERLY DENIED AGA'S PRELIMINARY INJUNCTION MOTION. ........................................................ 27

CONCLUSION ................................................................. 29

Appellate Case: 24-1410     Page: 4     Date Filed: 04/16/2024 Entry ID: 5384004

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*281 Care Comm. v. Arneson*,
  638 F.3d 621 (8th Cir. 2011) ................................................................. 8

*Adventist Health Sys./Sunbelt, Inc. v. U.S. Dep't of Health & Human Servs.*,
  17 F.4th 793 (8th Cir. 2021) ................................................................ 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. 13

*Bell Atl. Corp. v. Twombly*,
  500 U.S. 544 (2007) ............................................................................. 13

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ............................................................................. 27

*Brown v. City of St. Louis*,
  40 F.4th 895 (8th Cir. 2023) ................................................................ 12

*Christopherson v. Bushner*,
  33 F.4th 495 (8th Cir. 2022) ................................................................ 13

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ........................................................... 1, 27

*Ex Parte Young*,
  209 U.S. 123 (1908) ........................................................................... 7, 8

*Herron v. E.W. Scripps Co.*,
  776 Fed. App'x 929 (8th Cir. 2019) ...................................................... 2

*Idaho v. Coeur d'Alene Tribe of Idaho*,
  521 U.S. 261 (1997) ..................................................................... 1, 8, 10

*Kimel v. Fla. Bd. of Regents*,
  528 U.S. 62 (2000) .............................................................................. 23

iv

*Kraege v. Busalacchi*,
   687 F. Supp. 2d 834 (W.D. Wisc. 2009).................................................................. 11

*Luder v. Endicott*,
   253 F.3d 1020 (7th Cir. 2001)................................................................................. 10

*Madison v. Virginia*,
   474 F.3d 118 (4th Cir. 2006).................................................................................. 22

*Matthew v. Unum Life Ins. Co. of Am.*,
   639 F.3d 857 (8th Cir. 2011).................................................................................. 21

*Miller v. Redwood Toxicology Lab., Inc.*,
   688 F.3d 928 (8th Cir. 2012).................................................................................... 7

*Minn. RFL Republican Farmer Labor Caucus v. Freeman*,
   33 F.4th 985 (8th Cir. 2022) ..................................................................................... 6

*Mitchell v. Dakota Cnty. Soc. Servs.*,
   959 F.3d 887 (8th Cir. 2020).................................................................................. 24

*Nisi v. Brown*,
   369 F. Supp. 3d 848 (N.D. Ill. 2019) ........................................................................ 9

*Novus Franchising, Inc. v. Dawson*,
   725 F.3d 885 (8th Cir. 2013).................................................................................... 7

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012).................................................................................. 24

*Ohio Bureau of Emp. Servs. v. Hodory*,
   431 U.S. 471 (1977)................................................................................................ 24

*Okruhlik v. Univ. of Ark. ex rel. May*,
   255 F.3d 615 (8th Cir. 2001).................................................................................... 7

*Orduno v. Pietrzak*,
   932 F.3d 710 (8th Cir. 2019)................................................................................... 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ............................................................................................ 1, 10

v

*Planned Parenthood Fed'n of Am., Inc. v. Agency for Interim Dev.*,
  838 F.2d 649 (2d Cir. 1988)..................................................................... 22

*Planned Parenthood of Minn., N.D., & S.D. v. Rounds*,
  530 F.3d 724(8th Cir. 2008)................................................................ 1, 27

*Potocnik v. Carlson*,
  9 F. Supp. 3d 981 (D. Minn. 2014) ........................................................... 9

*Rine v. Imagitas, Inc.*,
  590 F.3d 1215 (11th Cir. 2009)........................................................ 1, 14, 18, 19

*Roberts v. Source for Public Data*,
  No. 08-4167-CV-C-NKL 2011 WL 1254099 (W.D. Mo. Mar. 31, 2011) .......... 11

*Rochester Methodist Hosp. v. Travelers Ins. Co.*,
  728 F.2d 1006 (8th Cir. 1984)................................................................. 11

*Rodriguez-Quiroz v. Lynch*,
  835 F.3d 809 (8th Cir 2016)................................................................... 23

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ........................................................................... 1, 8, 9

*Turtle Island Foods, SPC v. Thompson*,
  992 F.3d 694 (8th Cir. 2021)................................................................. 27

*Zean v. Fairview Health Servs.*,
  858 F.3d 520 (8th Cir. 2017)................................................................... 2

STATE CASES

*In re HAVA Elections Complaint of Buck*,
  No. 60-3500-38808, 2022 WL 18673274
  (Minn. Off. Admin. Hrgs. Feb. 6, 2023*)*............................................... 20

FEDERAL STATUTES

U.S. Const. amend. XI ............................................................................ 1

18 U.S.C. § 2721 ..........................................................................Passim

vi

18 U.S.C. § 2723 ................................................................. 8, 9

18 U.S.C. § 2724 ................................................................. 7

18 U.S.C. § 2725 ................................................................. 7, 8, 9

52 U.S.C. § 20901 ................................................................. 22

52 U.S.C. § 21083 ................................................................. Passim

52 U.S.C. § 21112 ................................................................. 20

**STATE STATUTES**

Minn. Laws ch. 238 § 2 ................................................................. 3

Minn. Stat. § 171.12 ................................................................. 5, 15

Minn. Stat. § 200.04 ................................................................. 20

Minn. Stat. § 201.12 ................................................................. 15

Minn. Stat. § 201.13 ................................................................. Passim

Minn. Stat. § 201.091 ................................................................. 23

Minn. Stat. § 201.171 ................................................................. 4, 15

Minn. Stat. § 204B.27 ................................................................. 15

**OTHER AUTHORITIES**

*Hearing on H.F. 2265 Before H. Comm. on Elections*,
  88th Leg. (Minn. 2014) ................................................................. 3

*The Driver's Privacy Protection Act of 1993: Hearing on H.R.* 3365 *Before the
  Sub-Comm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*,
  103rd Cong. (1994) ................................................................. 16

*Electronic Registration Information Center (ERIC) Frequently
  Asked Questions* (April 2, 2024) ................................................................. 2, 3

Appellate Case: 24-1410   Page: 8   Date Filed: 04/16/2024 Entry ID: 5384004

U.S. Election Assistance Comm'n, *Funding Advisory Opinion FOA-08-005* ............................................................................22

Appellate Case: 24-1410   Page: 9   Date Filed: 04/16/2024 Entry ID: 5384004

# STATEMENT OF ISSUES

I.      Is the Secretary immune from AGA's claims?

*The district court held that the Secretary was immune from AGA's official-capacity claims because the DPPA establishes a comprehensive remedial structure, and he was immune from AGA's individual-capacity claims because those claims were actually directed at the State of Minnesota.*

Most apposite authorities:
U.S. Const. amend. XI
*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)
*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997)
*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)

II.     Does the Drivers Privacy Protection Act prohibit the Office of the Secretary of State from sharing driver data with ERIC to increase voter roll accuracy and voter registrations?

*Although the Secretary raised this issue, the district court did not reach it because the court concluded the Secretary was immune from suit.*

Most apposite authorities:
18 U.S.C. § 2721 (2018)
52 U.S.C. § 21083 (2018)
*Rine v. Imagitas, Inc.*, 590 F.3d 1215 (11th Cir. 2009)

III.    Was AGA entitled to a preliminary injunction that prohibits the Office of the Secretary of State from sharing data with ERIC?

*The district court held that AGA was not entitled to a preliminary injunction because it was unlikely to succeed on the merits.*

Most apposite authorities:
*Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981)
*Planned Parenthood of Minn., N.D., & S.D. v. Rounds*, 530 F.3d 724 (8th Cir. 2008)

Appellate Case: 24-1410    Page: 10    Date Filed: 04/16/2024 Entry ID: 5384004

## STATEMENT OF THE CASE

In this case, AGA challenges OSS's sharing of driver data with ERIC. Thus, before delving into why that data sharing is legal, it is important to begin with background information regarding ERIC and how that data sharing benefits Minnesotans.

## I.     ERIC

In 2012, a bipartisan group of election officials from seven states founded a multi-state consortium called the Electronic Registration Information Center, or "ERIC." ERIC, *Electronic Registration Information Center (ERIC) Frequently Asked Questions* 1 (April 2, 2024) (hereinafter *ERIC FAQ*).[1] They created the organization to leverage data-matching technology and a robust interstate data-sharing program so that they could (1) vastly improve states' abilities to maintain accurate voter rolls and (2) better reach out to potential voters who were unregistered but likely eligible. *Id.* at 2.

To achieve ERIC's goals, each member state submits voter registration and motor-vehicle licensing and registration data to ERIC at least once every sixty days. (Appellants' App. 97; R. Doc. 7-2, at 17.) ERIC then uses data-matching software

---

[1] Available at https://perma.cc/58F6-NFKW. These facts are also embraced by the complaint because they are contained in a video relied upon by the complaint in paragraphs 70 and 100. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017); *Herron v. E.W. Scripps Co.*, 776 Fed. App'x 929, 930 n.2 (8th Cir. 2019) (considering video referenced in complaint).

2

to compare each state's data with the others and with Social Security death data and U.S. Postal Service change-of-address data. (Appellants' App. 97–98; R. Doc. 7-2 at 17–18.) After it conducts these comparisons, ERIC produces seven reports that it delivers to its member states: a report of cross-state movers, a report of in-state movers, a report of duplicate registrations, a report of deceased registrants, a report of eligible but unregistered individuals, a change-of-address report, and a voter-participation report. (*Id.*) States then act on these reports by contacting voters whose information is potentially out of date and, if necessary, updating the voters' records as required by state or federal law. (Appellants' App. 103–04; R. Doc. 7-2, at 23–24.)

## II. MINNESOTA LAW AND ERIC

In 2014, the Minnesota Legislature authorized the state to join ERIC. 2014 Minn. Laws ch. 238, § 2, at 765-66 (enacting Minn. Stat. § 201.13, subd. 3(d)); *see also Hearing on H.F. 2265 Before H. Comm. on Elections*, 88th Leg. at 15:08–45 (Minn. Mar. 4, 2014) (statement of Rep. Carolyn Laine) (explaining that purpose of legislation was to permit Minnesota to join ERIC).[2] State law authorizes OSS to provide ERIC with a broad collection of data from the state's voter registration database, the Statewide Voter Registration System (SVRS). Minn. Stat. § 201.13, subd. 3(d) (2022).

---

[2] Available at https://www.lrl.mn.gov/audio/house/2014/elec030414.mp3.

3

Because Minnesota is a member of ERIC, OSS regularly sends it data and receives information in return. (Appellants' App. 75–80; R. Doc. 7-1, at 28–33.) OSS provides ERIC with some, but not all, of the information from the SVRS records of the individuals who are currently registered to vote in Minnesota. (Appellants' App. 97, 109; R. Doc. 7-2, at 17, 29.) ERIC then uses this information to provide Minnesota with the results of its cross-referencing analysis that are relevant to this state. (Appellants' App. 97–98; *Id.* at 17–18.) For example, ERIC may notify the state that the data indicate that a particular individual has moved to a new location within Minnesota, or that another individual is registered to vote in both Minnesota and a different state. (*Id.*)

Finally, ERIC provides information to OSS identifying Minnesotans who appear to be eligible to vote but who have not registered. (Appellants' App. 103; R. Doc. 7-2, at 23.)[3] OSS periodically contacts these individuals to encourage them to register. (*Id.*)

---

[3] AGA repeatedly characterizes these eligible-but-unregistered individuals as persons who have "declined" to register to vote. (*See* Appellants' Br. 4–6, 9, 38, 48.) But there are myriad reasons, other than declining to register to vote, that a person could have a Minnesota driver's license but not an active registration record in the SVRS. For example, they may inadvertently overlook the voter-registration checkbox on their driver's license application. Or a person may have been already registered when the person applied for a driver's license, but the person's voter registration subsequently lapsed because the person failed to vote for four years. *See* Minn. Stat. § 201.171 (2022) (requiring OSS to make voter's SVRS record inactive if registrant fails to vote during preceding four years).

4

## III. INFORMATION SHARING BETWEEN DEPARTMENT OF PUBLIC SAFETY AND OSS

The federal Help America Vote Act (HAVA) requires state departments of motor vehicles to share information with state election agencies to improve the accuracy of their voter rolls. 52 U.S.C. § 21083(a)(5)(B)(i). Pursuant to this provision, as well as a parallel state statute, the Driver and Vehicle Services Division of the Minnesota Department of Public Safety provides information to OSS pertaining to licensed drivers. Minn. Stat. § 171.12, subd. 7a (2022) (requiring Department of Public Safety to provide driver's license data to OSS "for the purpose of increasing voter registration and improving the accuracy of voter registration records in the statewide voter registration system"); (Appellants' App. 111–36; R. Doc. 7-3, at 1–26.)

Under state law, the data that OSS is authorized to share with ERIC consist, in part, of the driver's license information that the Department of Public Safety provides to OSS. Minn. Stat. § 201.13, subd. 3(d) (authorizing sharing of "data released to the secretary of state under section 171.12, subdivision 7a"); *see also id* § 171.12, subd. 7a.

## IV. PROCEDURAL HISTORY

In October 2023, after Minnesota had been one of numerous states participating in ERIC for more than nine years, AGA filed suit, asserting that sharing data with the bipartisan multistate consortium violates the Drivers' Privacy

5

Protection Act (DPPA). (R. Docs. 1, 7.) The Secretary moved to dismiss, and AGA moved for a preliminary injunction. (R. Docs. 9, 11.) The district court granted the motion to dismiss and denied the injunction. (Appellants' App. 10; R. Doc. 41, at 10.) AGA appeals the district court's dismissal of their individual capacity claims and denial of a preliminary injunction.

## SUMMARY OF ARGUMENT

The Court should affirm the dismissal of AGA's claims. The district court correctly held that the Secretary is immune from AGA's official-capacity claims because the DPPA already sets up a comprehensive remedial scheme that excludes such claims. And the district court also correctly held that the Secretary is immune from AGA's individual-capacity claims on the grounds that those claims are actually directed against the state because they seek to enjoin a state program explicitly approved by the Minnesota legislature. Alternatively, the Court should affirm because AGA did not allege that the Secretary took any individual action that would violate the DPPA and because the OSS's data sharing with ERIC is explicitly authorized by the DPPA. Because AGA's claims are unlikely to succeed, the Court should also affirm denial of the motion for a preliminary injunction.

## ARGUMENT

This Court reviews questions involving immunity, pleading sufficiency, and statutory interpretation de novo. *Minn. RFL Republican Farmer Labor Caucus v.*

Appellate Case: 24-1410    Page: 15    Date Filed: 04/16/2024 Entry ID: 5384004

*Freeman*, 33 F.4th 985, 989 (8th Cir. 2022) (immunity); *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 936 (8th Cir. 2012) (pleading sufficiency and whether pleaded facts violate law). This Court reviews the denial of a preliminary injunction decision for abuse of discretion. *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013) (preliminary injunction).

## I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE SECRETARY IS IMMUNE FROM SUIT.

The DPPA places restrictions on the disclosure of driver data. 18 U.S.C. § 2721(a) (2018). It also creates a private cause of action for violations. *Id.* § 2724(a) (2018). But, consistent with the Eleventh Amendment, the DPPA expressly bars private party lawsuits against states and their agencies. 18 U.S.C. § 2724–25 (2018) (excluding "a State or agency thereof" from list of persons who may be sued by private parties under the DPPA). AGA attempts to avoid this limitation by arguing it can lawfully bring *Ex Parte Young*-style official-capacity claims under the DPPA[4] and by pursuing purportedly individual-capacity claims against the Secretary. Neither argument has merit.

---

[4] It is unclear whether AGA is still pursuing official-capacity claims on appeal. Its statement of the issues refers to seeking "prospective injunctive relief against state officials, *individually*," the bulk of its argument refers to claims against the Secretary as an "individual," and the one portion that does discuss *Ex Parte Young* states the argument as being, "[i]n other words," about "individual capacity claim[s]." (Appellants' Br. 2, 11, 14, 22–23.) In addition to being meritless, AGA has also likely forfeited this argument by failing to adequately brief it. *See Okruhlik v. Univ.* (Footnote Continued on Next Page.)

## A. *Ex Parte Young* Relief Is Not Available Under the DPPA.

The Eleventh Amendment generally bars civil actions against states and their officials.[5] *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267–68 (1997). *Ex Parte Young* provides an exception to this immunity. 209 U.S. 123, 159–60 (1908). Under that doctrine, a private party can sue a state officer in his official capacity to enjoin prospective action that would violate federal law. *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011). But such claims are unavailable "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996).

The district court correctly rejected AGA's *Ex Parte Young* argument on this basis. The DPPA contains precisely the "detailed remedial scheme" that makes such arguments unavailable. The DPPA expressly addresses which state entities may be subject to suit, who may bring such suits, and what remedies are available in such cases. *See* 18 U.S.C. §§ 2723, 2725. Under this carefully crafted balance, state agencies are generally immune from suit—except that the United States Attorney

---

*of Ark. ex rel. May*, 255 F.3d 615, 621 (8th Cir. 2001) ("We need not address complex constitutional issues that have not been adequately briefed.").

[5] Congress may abrogate such immunity to vindicate rights secured by the Fourteenth Amendment. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996). But Appellants have never alleged, nor could they, that OSS's actions violate the Fourteenth Amendment. Instead, Appellants acknowledge the DPPA was passed under Congress's Commerce Clause authority. (Appellants' Br. 19.)

General may enforce the DPPA by seeking civil penalties from state motor vehicle departments that violate the act. *Id.* § 2723(b). AGA would upend this balance established by Congress. Under AGA's theory, Congress could never choose to limit enforcement against state agencies—because, notwithstanding such limits, parties like AGA would still always be free to sue individual state officials. This freewheeling expansion of remedies beyond those contemplated by Congress is precisely the approach the Supreme Court rejected in *Seminole Tribe. See* 517 U.S. at 75–76.

For these reasons, the only two courts that appear to have considered this issue have both held that *Ex Parte Young* claims are unavailable for private parties to enforce the DPPA. *Nisi v. Brown*, 369 F. Supp. 3d 848, 853 (N.D. Ill. 2019) ("[T]he Court is not persuaded that Congress intended for the *Ex parte Young* exception to apply in private actions under the DPPA."); *Potocnik v. Carlson*, 9 F. Supp. 3d 981, 991 n.5 (D. Minn. 2014) ("Because the DPPA specifically provides for a separate civil-penalty provision against state motor-vehicle departments, however, the Court interprets the DPPA to preclude even suits for prospective relief against state officials acting in their official capacities."). Although these decisions are not binding on this Court, they demonstrate that AGA's position has yet to find any support anywhere.

9

**B.** **The Secretary Is Immune from AGA's Individual-Capacity Claims Because Those Claims Are Actually Directed Against the State.**

Turning to AGA's individual-capacity claims, Eleventh Amendment immunity also extends to individual-capacity claims "if the decree would operate against the [sovereign]." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). A judgment operates against a sovereign if the judgment would interfere with public administration or restrain the government from acting. *Id.* at 101 n.11. In such cases, "[t]he real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading." *Coeur d'Alene*, 521 U.S. at 270.

Here, the district court correctly held that the Secretary is immune from AGA's DPPA claims because the judgment AGA seeks would actually operate against Minnesota, not merely the Secretary individually. AGA alleged that federal law preempts the state law that authorizes OSS to share SVRS data with ERIC, Minn. Stat. § 201.13, subd. 3(d), and it sought to enjoin the data sharing under that section. (Appellants' App. 24; R. Doc. 7, at 24, ¶ 141.) Enjoining a state statute indisputably would interfere with public administration and restrain Minnesota from acting under that statute. Indeed, although "nominally against state employees in their individual capacities," AGA's claims would "*demonstrably* [have] the *identical* effect as a suit against the state." *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001). As a result, the claims are barred by the Eleventh Amendment. *Id.*; *see also*

10

*Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1012 (8th Cir. 1984) ("A suit brought nominally against a government agent that seeks injunctive or other specific relief is much more likely to be deemed one against the [government] than one that seeks damages.").

Lower courts that have considered this question have agreed that challenges to state policies under the DPPA are actually claims against the state. For example, in *Kraege v. Busalacchi*, private plaintiffs sued senior officials from the Wisconsin Division of Motor Vehicles in their individual capacities, asserting that Wisconsin's policies permitting the sale of driver information violated the DPPA. 687 F. Supp. 2d 834, 835–37 (W.D. Wisc. 2009). Noting that "it is the state's policies, and not defendants' implementation of them, that are at the heart of plaintiffs' complaint," the court held that the plaintiffs' claims were barred by the Eleventh Amendment. *Id*. at 836, 839.

Similarly, in *Roberts v. Source for Public Data*, two individuals sued officials from the Missouri Department of Revenue in their individual capacities, contending that the department's disclosure of driver information to private purchasers, though permitted by department policy, violated the DPPA. No. 08-4167-CV-C-NKL, 2011 WL 1254099, at *1–2 (W.D. Mo. Mar. 31, 2011). The court held that the defendants were immune from suit under the Eleventh Amendment because the State of Missouri was "the real, substantial party in interest" in the litigation. *Id*. at *9.

11

AGA relies on *Orduno v. Pietrzak*, 932 F.3d 710 (8th Cir. 2019), but that case is distinguishable from the one at bar. (Appellants' Br. 12.) *Orduno* involved true individual-capacity claims for individual actions that were not based in any official policy: in that case, the individual defendant accessed driver's license records based on a personal vendetta rather than for law-enforcement purposes. *Orduno*, 932 F.3d at 714, 717 ("He accessed the database for personal reasons, not under the auspices of official policymaking authority, so his actions did not represent a policy of the City."). Moreover, the *Orduno* plaintiff sought damages, not an injunction of any law. *Id.* at 714. Here, by contrast, AGA seeks to enjoin the Secretary from carrying out his official responsibilities under state law. Accordingly, the Court should reject AGA's disingenuous attempt to construe its claims as individual-capacity claims and affirm the district court's decision to dismiss them.

## II. AGA FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

In the district court, the Secretary raised alternative bases for dismissing AGA's claims: first, their individual-capacity claims failed to identify any actions personally taken by the Secretary that would violate the DPPA; and second, all their claims rest on an incorrect reading of the DPPA. The Court may affirm on any basis supported by the record. *Brown v. City of St. Louis*, 40 F.4th 895, 903 (8th Cir. 2023).

## A. AGA's Individual-Capacity Claims Do Not Allege Any Wrongdoing Personally Committed by the Secretary.

A complaint that fails to state a claim that is plausible on its face must be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this assessment, the Court must assume the complaint's factual allegations are true, but it need not defer to any legal conclusion. *Bell Atl. Corp. v. Twombly*, 500 U.S. 544, 555 (2007). The factual allegations must be sufficient to "raise a right to relief above the speculative level." *Id*. "Threadbare" recitals of the elements of a cause of action that are supported by "mere conclusory statements" do not satisfy this standard. *Christopherson v. Bushner*, 33 F.4th 495, 499 (8th Cir. 2022).

AGA's purported individual-capacity claims fail this test. AGA alleged only that the Secretary "acted ultra vires in approving or implementing contracts which authorize the disclosure of [Appellants'] DPPA-protected information." (Appellants' App. 45–46; R. Doc. 7, at 35–36, ¶ 220.) AGA did not assert that the Secretary transferred data to ERIC—thereby, according to AGA, disclosing driver data in violation of the DPPA. Indeed, outside of paragraphs identifying Appellees Simon and Maeda as parties and as the targets of relief, the allegation regarding "approving or implementing contracts" is the only statement in the entire complaint that references Appellees. (*See generally* Appellants' App. 11–47; R. Doc. 7, at 1–37, ¶ 220.)

13

The allegation that the Secretary "approv[ed] or implement[ed] contracts" is facially vague: it does not identify any specific acts the Secretary took. It is also entirely conclusory, because (far from being ultra vires) the Secretary is explicitly allowed to enter into agreements to share data under Minnesota law. Minn. Stat. § 201.13, subd. 3(d). Accordingly, the Court may alternatively affirm dismissal of the individual-capacity claims on this basis.

**B.     The DPPA Does Not Prohibit OSS's Data Sharing.**

All of AGA's claims also fail on their merits. The DPPA expressly permits government entities to disclose driver's-license data in a number of specific ways. For example, the Act allows government agencies to disclose driver's-license data both for the purpose of carrying out government functions and for research purposes. 18 U.S.C. § 2721(b)(1), (5) (2018). OSS's data sharing with ERIC falls into both of these categories.

**1.     The DPPA authorizes OSS's data sharing with ERIC because it contributes to Minnesota election officials' government functions.**

Driver's-license data covered by the DPPA may be disclosed "[f]or use by any government agency . . . in carrying out its functions, or any private person or entity acting on behalf of a . . . State or local agency in carrying out its functions." 18 U.S.C. § 2721(b)(1). What constitutes a state or local agency function under the DPPA is a question of state law, and courts will "defer to [the state] as to the proper

14

activities of the [agency]." *Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1224–25 (11th Cir. 2009) (rejecting DPPA challenge to Florida's sharing of driver data with contractor).

Here, OSS's data sharing with ERIC unquestionably falls into this category. OSS and the county and local governments that administer elections in Minnesota are all indisputably government agencies. Minnesota law commits to OSS the functions of "increasing voter registration and improving the accuracy of voter registration records" by using driver's-license data. Minn. Stat. § 171.12, subd. 7a(b) (2022). State law also charges OSS with increasing voter registration and turnout by sponsoring or participating in nonpartisan activities that promote voter participation in Minnesota elections. *Id.* § 204B.27, subd. 6. Moreover, county and local election officials have a range of responsibilities related to maintaining the SVRS database—including removing duplicate records and revising SVRS records to reflect that voters have died or have moved either within or out of the state. Minn. Stat. §§ 201.12, subds. 2-3, .13, subds. 1-3, .171. OSS's work with ERIC assists OSS and other election agencies in Minnesota in carrying out these duties.

AGA resists this conclusion with a series of arguments regarding the scope of the government-function clause of the DPPA. None of these arguments has merit.

First, AGA argues that because OSS's contract with ERIC disclaims an agent, fiduciary, partner, or joint venture relationship, ERIC cannot be acting on OSS's behalf to carry out OSS's functions. (Appellants' Br. 46.) But ERIC's contract status

is immaterial to the permitted uses in section 2721(b) of the DPPA. Like the other kinds of entity relationships that AGA cites, agency is a technical concept in law that affects contracting rights and potential litigation claims between parties to an agreement. The contract term disclaiming this technical status does not change the fact that ERIC is nonetheless a private entity "acting on behalf of a . . . State . . . agency in carrying out its functions." 18 U.S.C. § 2721(b)(1).

Indeed, the DPPA's sponsor in the House of Representatives explicitly stated that "[a]mong those who will continue to have unfettered access are federal and state governments *and their contractors*"—even though contractors are generally not agents, fiduciaries, partners, or joint venturers. *The Driver's Privacy Protection Act of 1993: Hearing on H.R. 3365 Before the Sub-Comm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 103rd Cong. (1994) (Statement of Rep. Moran) (emphasis added).

In particular, ERIC  analyzes voter data and provides reports back to OSS by (1) receiving voter-registration and driver's license data from Minnesota, (2) comparing those data to one another and to similar data from other states, and (3) reporting back to Minnesota officials so that they can make corrections to the voter-registration database and contact individual Minnesotans who appear to be eligible to vote but unregistered. Those functions are all either required or authorized

16

by Minnesota law—and, as a result, ERIC's activities undeniably assist state and local agencies in carrying out their functions.

Second, AGA argues ERIC cannot be performing a government function because (according to AGA) OSS is sharing data with ERIC unnecessarily frequently. (Appellants' Br. 46–47.) But AGA's private judgments as to the appropriate frequency of data sharing are immaterial to whether that sharing is permitted by the DPPA. Moreover, as AGA acknowledges, a major portion of ERIC's work involves generating reports by cross-referencing data ERIC has received from multiple states. Thus, it furthers all member states' interest to provide ERIC with frequent data updates, even if ERIC produces reports at a marginally slower pace. Accordingly, the frequency with which OSS shares data with ERIC has nothing to do with the fact that such sharing helps OSS and other Minnesota government entities fulfil their lawful functions.

Third, AGA argues that because OSS already internally uses driver's-license data to improve voter roll accuracy, it is inconceivable that sharing data with ERIC could further improve that accuracy. (Appellants' Br. 47.) But although OSS's internal processes provide meaningful tools for ensuring accurate voter rolls, ERIC has access to a significantly larger dataset because it has voter data from more than twenty other states. For example, ERIC's report of cross-state movers could not be

17

produced with only Minnesota data. This larger dataset self-evidently allows ERIC to provide more accurate results than OSS could with Minnesota data alone.

Fourth, AGA argues that because eligible-but-unregistered lists *could* be generated internally within OSS, they *must* be generated internally—and therefore supplying ERIC with the data necessary to generate those lists is not carrying out a government function. (Appellants' Br. 48.) As noted above, however, sharing data with ERIC leads to more accurate lists. Moreover, even if AGA were correct that OSS *could* generate eligible-but-unregistered lists internally, that would not demonstrate that OSS *must* do so. To the contrary, the DPPA expressly allows OSS to engage the assistance of private entities (such as ERIC) in carrying out government functions. Indeed, the Eleventh Circuit explicitly rejected a DPPA challenge to private entity that carried out the government function of distributing vehicle registration renewal notices. *Rine*, 590 F.3d at 1219. ERIC is similarly carrying out a government function here, and that delegation is one of the uses of driver's-license data explicitly permitted by the DPPA.

Fifth, AGA argues that because local government officials are ultimately responsible for updating voter records, OSS receiving information from ERIC to further that function cannot itself be a government function. (Appellants' Br. 49.) This argument ignores the plain terms of both the DPPA and Minnesota law. First, the DPPA authorizes a private entity such as ERIC to use driver's license data when

18

it is "acting on behalf of a . . . State . . . agency in carrying out its functions"—that is, *the government agency's* functions. That precisely describes ERIC's performance under its agreement with OSS. Moreover, Minnesota law expressly contemplates the exact arrangement established in that agreement. If the Secretary receives information for updating voter records based on an agreement with an organization governed exclusively by a group of states (i.e. ERIC), "the secretary and county auditors *must* process changes to voter records based upon that data." Minn. Stat. § 201.13, subd. 3(d) (emphasis added). AGA's argument regarding the lack of explicit delegation of list maintenance responsibilities by county officials is therefore immaterial. The legislature, which is the source of those county officials' authority in the first instance, has explicitly directed them to make changes based on ERIC's reports. *See id.*

In conclusion, AGA's arguments that ERIC is not performing a government function all follow the theory that because Minnesota *could* choose a different way to fulfill those functions, it *must* do so. But the forum for deciding these policy disputes is the state legislature, not this Court. Sharing data with ERIC to obtain reports to promote voter roll accuracy and increase voter registrations furthers the governmental functions that Minnesota law assigns to OSS and to local election officials, even if those functions could also be approached in other ways. Accordingly, OSS's data sharing is permitted by the DPPA.

19

## 2. HAVA does not impact permissible government functions under the DPPA.

AGA also argues that HAVA limits which government functions the DPPA permits and that OSS's data sharing with ERIC cannot be a legitimate government function.[6] More specifically, AGA argues that HAVA allows using driver data only to verify the accuracy of voter registration information, that HAVA prohibits state-funded voter registration drives, and that sharing data with ERIC violates HAVA's discrimination prohibition. None of these arguments have merit. Moreover, AGA forfeited its HAVA discrimination-prohibition argument by failing to raise it below.

### a. HAVA does not limit voter data sharing.

HAVA requires the Secretary to match information in the SVRS with information from Minnesota's driver database. 52 U.S.C. § 21083(a)(5)(B)(i) (2018). AGA somehow reads this unambiguous affirmative command to contain a further prohibition on doing anything *else* with these sets of data. (Appellants' Br. 42–43.) This argument is entirely unsupported by HAVA.

---

[6] Notably, AGA has not pled and could not directly plead its case as a violation of HAVA. Instead, such complaints must follow a state-based administrative complaint procedure. 52 U.S.C. § 21112(a)(1) (2018); *see also* Minn. Stat. § 200.04 (2022). A 2022 complaint filed under this procedure asserting that Minnesota's data sharing violated HAVA was dismissed as groundless. *In re HAVA Elections Complaint of Buck*, No. 60-3500-38808, at 5-10, 2022 WL 18673274, at *3–7 (Minn. Off. Admin. Hrgs. Feb. 6, 2023).

Appellate Case: 24-1410     Page: 29     Date Filed: 04/16/2024 Entry ID: 5384004

HAVA requires that the Secretary "and the official responsible for the State motor vehicle authority of a State . . . enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration." 52 U.S.C. § 21083(a)(5)(B)(i). In interpreting statutes, courts will not "reads words into the statute that are not there." *Matthew v. Unum Life Ins. Co. of Am.*, 639 F.3d 857, 867 (8th Cir. 2011).

AGA is asking the Court to read words into HAVA that are not there. AGA insists that under section 21083, the Secretary can *only* use driver data to match information in the SVRS and *only* to verify the accuracy of voter registration information. (Appellants' Br. 43.) But the word "only" appears nowhere in the relevant language. HAVA requires the Secretary to take certain actions to verify voter registration information using driver data. Nothing in HAVA prohibits OSS from doing other things with that data as well—including sharing it with ERIC.

> **b.  HAVA does not prohibit state-sponsored voter registration drives.**

AGA argues that because HAVA funds cannot generally be used for voter-registration drives, states cannot conduct such drives at all. (Appellants' Br. 37–41.) In support of this argument, AGA relies on a statute providing that HAVA funds may be used for "[e]ducating voters concerning voting procedures, voting rights, and

21

21

voting technology," as well as an advisory opinion by the Election Assistance Commission holding that such usage does not include voter registration drives. 52 U.S.C. § 20901(b)(1)(C) (2018); U.S. Election Assistance Comm'n, *Funding Advisory Opinion FAO-08-005*.[7] But neither of these authorities limits the use of state's own funds.

It is well-recognized that a limitation on a state's use of federal funds for an activity does not prohibit the state from using its own funds to carry out that activity. *See, e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Agency for Interim Dev.*, 838 F.2d 649, 654–55 (2d Cir. 1988). Thus, absent Congress imposing a program-wide prohibition as a condition of receiving federal aid, states are free to use their own funds for components of programs that are ineligible for federal funding. *E.g., Madison v. Virginia*, 474 F.3d 118, 126 (4th Cir. 2006).

Here, the authorities cited by AGA explicitly disclaim such a broad prohibition. The HAVA funding statute addresses only how "[a] State shall use the funds provided under a payment made *under this section*," not other funding sources. 52 U.S.C. § 20901(b)(1) (2018). And the Election Assistance Commission advisory opinion addresses only the use of HAVA funds, not state funds. U.S. Election Assistance Comm'n, *Funding Advisory Opinion FAO-08-005*. Here, AGA does not

---

[7] Available at https://www.eac.gov/sites/default/files/document_library/files/FAO-08-005_EAC_1.pdf.

Appellate Case: 24-1410     Page: 31     Date Filed: 04/16/2024 Entry ID: 5384004

allege (and it would not be true if it did) that OSS is using HAVA funds to contact eligible-but-unregistered voters. Accordingly, HAVA does not preempt Minnesota from conducting voter registration drives with non-HAVA funds.

### c. AGA forfeited its discrimination argument, and it is meritless.

AGA argues for the first time on appeal that OSS's data sharing violates HAVA because it is supposedly being performed in a discriminatory manner. (Appellants Br. 32–37.) But failing to raise an argument in the district court forfeits that argument. *Rodriguez-Quiroz v. Lynch*, 835 F.3d 809, 822 n.6 (8th Cir 2016). AGA cannot pursue this argument before this Court.

Regardless, the argument also fails on the merits. HAVA requires the Secretary to implement a statewide voter registration list "in a uniform and nondiscriminatory manner." 52 U.S.C. § 21083(a)(1)(A) (2018). In essence, AGA argues that, because OSS shares data with ERIC for the specific purposes of obtaining reports to increase voter roll accuracy and aid in voter registration, OSS must share data with anyone for any reason. This is despite the fact that state law authorizes the data sharing for those purposes while otherwise limiting access to voter-registration data. Minn. Stat. §§ 201.13, subd. 3(d), 201.091. Sharing data with ERIC but not others is not discriminatory. "Nondiscriminatory" is not defined within HAVA, but in the equal-protection context, the Supreme Court has recognized that states can draw lines when they are supported by a rational basis. *Kimel v. Fla. Bd.*

*of Regents*, 528 U.S. 62, 86 (2000).[8] Thus, where two individuals are not similarly situated, treating them differently is not discrimination. *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 899 (8th Cir. 2020).[9]

Here, ERIC is not similarly situated to entities with whom OSS has declined to share SVRS data. Notwithstanding their repeated attempts to cast ERIC as a shadowy "private corporation," AGA nevertheless agrees that unlike most corporations, ERIC is comprised "solely of state, territorial governmental units, [and] the District of Columbia." (*Compare* Appellants' Br. 9, *with* Appellants' App. 51; R. Doc. 7-1, at 4.) And the Secretary has a detailed contract with ERIC protecting the shared data and placing limits on its usage. The people whom AGA and amicus identify (Andy Cilek and President Trump's Presidential Advisory Commission on Election Integrity, respectively) were not similarly situated. Unlike ERIC, sharing data with those entities would not further any of OSS's election-administration

---

[8] Of course, the standard is higher when lines are drawn based on a protected class. *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 489 (1977). But there is no allegation of such discrimination in this case.

[9] Although not addressed by AGA, the case they cite in support of their discrimination argument recognizes as much. *See Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all *relevant* respects alike." (internal quotation marks omitted)).

Appellate Case: 24-1410     Page: 33     Date Filed: 04/16/2024 Entry ID: 5384004

responsibilities. Furthermore, Cilek and the Commission did not propose any limits on how they could use the SVRS data.

Finally, even if distinguishing between a coalition of states with robust privacy protections, on the one hand, and entities seeking carte blanche access to data, on the other, were discriminatory, the HAVA language AGA relies upon only applies to "implement[ing] . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). Sharing the information within that list is entirely distinct from implementing it. Indeed, as AGA points out, "ERIC cannot . . . remove any voters and cannot . . . make any changes to the state voter registration data." (Appellants Br. 15.) Clearly, if ERIC has no ability to change the computerized list itself, that lack of contact cannot affect how the list is implemented.

### 3. The DPPA authorizes OSS's data sharing with ERIC for research.

Driver's-license data covered by the DPPA may also be disclosed "[f]or use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals." 18 U.S.C. § 2721(b)(5). Although the term is not defined in the DPPA, "research" is commonly understood as "studious inquiry or examination, *especially*: investigation or experimentation aimed at the discovery and interpretation of facts, revision of accepted theories or laws in the light of new facts, or practical application of such

25

new or revised theories or laws; the collecting of information about a particular subject; [and] careful or diligent search." *Research*, MERRIAM-WEBSTER.[10]

AGA does not dispute that the reports ERIC produces based on OSS's data sharing constitute research. (Appellants' Br. 48–49.) Instead, it argues that, because OSS uses the reports it receives to contact eligible-but-unregistered voters, the data is being "used to contact individuals" in a manner prohibited by the DPPA. This argument is meritless.

There is no dispute that OSS already possesses the contact information of eligible-but-unregistered individuals before that data has been shared with ERIC. Thus, but for the fact that ERIC needs to filter the data to generate eligible-but-unregistered lists, OSS already has the information needed to contact those individuals. But under AGA's view, because ERIC first reviews the data to determine who is unregistered, OSS using that same (now distilled) data to contact potential voters violates the DPPA. This is an absurd reading of the statute. Instead, the DPPA bars only research that itself involves contacting individuals, not research that leads to the initial (and indisputably lawful) possessor of the data using data it already possessed to contact individuals. *See* 18 U.S.C. § 2721(b)(5). Accordingly, OSS's data sharing with ERIC is a research purpose authorized by the DPPA.

---

[10] Available at https://www.merriam-webster.com/dictionary/research (last visited March 22, 2024).

Appellate Case: 24-1410     Page: 35     Date Filed: 04/16/2024 Entry ID: 5384004

## III. THE DISTRICT COURT PROPERLY DENIED AGA'S PRELIMINARY INJUNCTION MOTION.

AGA also appeals the denial of its motion for a preliminary injunction. The district court correctly concluded that AGA's failure on the merits is fatal to its preliminary injunction motion. Moreover, AGA also failed to satisfy the other *Dataphase* factors.

A preliminary injunction is an extraordinary remedy. *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). In determining whether to grant preliminary injunctive relief, courts consider (1) the probability of its success on the merits, (2) the threat of irreparable harm to the party seeking the injunction, (3) the balance between the harm to the party seeking the injunction and any injury that the injunctive relief would inflict upon the other parties, and (4) the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The first factor has particular weight. *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). When a lawsuit challenges a state statute, the likelihood-of-success factor supports a preliminary injunction only if the party seeking to enjoin the statute can show that the party is "likely to prevail on the merits." *Planned Parenthood of Minn., N.D., & S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (distinguishing injunctions against private conduct, which require only a "fair chance" of prevailing, and the heightened standard applicable to injunctions against statutes).

27

None of these factors support AGA. For the reasons discussed above, AGA's claims fail on the merits, so they are certain not to succeed. Nor do any of the other factors favor AGA. Beginning with risk of harm, "a long delay . . . after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." *Adventist Health Sys./Sunbelt, Inc. v. U.S. Dep't of Health & Human Servs*., 17 F.4th 793, 805 (8th Cir. 2021) (internal quotation marks omitted). Here, OSS has been sharing data with ERIC since 2014, yet AGA did not bring this lawsuit until 2023. That OSS has been sharing data with ERIC for almost a decade without incident strongly indicates that a preliminary injunction is unnecessary.

Balanced against this lack of harm is the severe risk to the operation of the Minnesota procedures that ensure the accuracy of the state's voter registration database. Both the Minnesota Legislature and OSS have determined that the services that ERIC provides benefit the people of Minnesota. Specifically, ERIC's work helps state and local election officials correct the state's voter rolls and encourage eligible Minnesotans to register to vote. AGA's demand is that these crucial services be eliminated—making it far more difficult, for example, for the state to learn that a given individual is registered to vote in both Minnesota and Wisconsin—based on fallacious claims of harm. The injunction AGA seeks would inflict serious damage

28

on Minnesota's election system (especially severe damage, in light of the fact that 2024 is a presidential election year) in exchange for no legitimate benefit to anyone.

For much the same reasons, the public interest cuts heavily in favor of denying the motion. Minnesotans have a strong interest in keeping the state's voter rolls well maintained and in strengthening democracy within the state by increasing the proportion of eligible citizens of Minnesota who are registered to vote. They have no interest in enforcing illusory rights that are founded in misinterpretations of federal law.

## CONCLUSION

The Secretary is immune from AGA's claims. Even if he were not, the claims also fail on their merits. The Court should affirm the district court's dismissal and its denial of a preliminary injunction.

Dated:  April 15, 2024

Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General

/s/**Allen Cook Barr**
NATHAN J. HARTSHORN, #0320602
ALLEN COOK BARR, #0399094
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1487
allen.barr@ag.state.mn.us
ATTORNEYS FOR APPELLEES

29

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,030 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

/s/**Allen Cook Barr**
ALLEN COOK BARR
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies that the brief has been scanned for viruses and that the brief is virus-free.

/s/**Brenda Hanson**
BRENDA HANSON

30

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I caused Appellees' Brief to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/**Allen Cook Barr**
ALLEN COOK BARR